Filed 3/30/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| EAST OAKLAND STADIUM ALLIANCE et al., | |
|      Plaintiffs and Appellants, | |
| v. | A166221 |
| CITY OF OAKLAND et al., | |
|      Defendants and Appellants; | (Alameda County Super. Ct. No. 22CV009325) |
| ATHLETICS INVESTMENT GROUP, LLC, et al., | |
|      Real Parties in Interest and Appellants. | |

Oakland's professional baseball team proposes to construct a new ballpark and a large, adjoining development featuring several new commercial and residential buildings. The proposed building site is currently used largely for parking and storage activities associated with the Port of Oakland. Among other issues of public concern, the soil at the project site is contaminated from long years of industrial use; the ballpark and development will generate substantial new pedestrian and

1

vehicle traffic in the neighborhood; and the site's existing uses must be relocated.

Pursuant to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)),[1] the City of Oakland (City) prepared an environmental impact report (EIR) for the project. Following the City's certification of the EIR, appellants (petitioners) filed petitions for a writ of mandate challenging the EIR's compliance with CEQA. In an extensive written decision, the trial court found inadequate one mitigation measure designed to address the project's adverse wind effects, but it rejected petitioners' other claims. The judgment required the City to reconsider and revise the wind mitigation measure and otherwise denied the petitions.

Petitioners appeal the denial of the bulk of their claims, while the City, the Oakland City Council, the Port of Oakland (Port), and the project sponsor, Athletics Investment Group, LLC (respondents), have filed cross-appeals of the trial court's rejection of the wind mitigation measure.[2] We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Oakland Waterfront Ballpark District Project (project) proposes an ambitious redevelopment of Howard Terminal, a 50-acre site within the Port, and five acres of contiguous parcels. The centerpiece is a 35,000-seat ballpark for the city's Major League Baseball team, the Oakland Athletics (A's), but the

---

[1] All subsequent statutory references are to the Public Resources Code, unless indicated otherwise.

[2] Although these entities filed separate notices of cross-appeal, they joined on the briefs in this court.

2

project also anticipates construction of 3,000 residential units, 270,000 square feet of retail space, 1.5 million square feet of space for other commercial uses, a performance venue, and up to 400 hotel rooms. There will be parking for 8,900 vehicles, and nearly 20 acres will be set aside as publicly accessible open space. It is estimated that the project will take eight years to complete.

Howard Terminal borders an estuary southwest of the City's downtown. Portions of the site are currently used for various commercial maritime activities, but most of the land is devoted to truck parking and container storage. A rail line serving passenger and freight traffic runs down the middle of Embarcadero West, the street forming the northern border of Howard Terminal.

The City began preparation of an EIR for the project in November 2018 and issued a draft EIR in February 2021. The City Council certified the final EIR a year later, adopting extensive findings. Among these findings was a statement of overriding considerations, concluding that the project's benefits outweighed several significant environmental impacts that could not be fully mitigated.

Three writ petitions challenging the adequacy of the EIR were consolidated for hearing. Except with respect to one wind mitigation measure, the trial court rejected petitioners' claims, finding the EIR adequate and the City in compliance with CEQA. The judgment directed the City to reconsider its adoption of the wind mitigation measure, but otherwise denied the petitions.

**DISCUSSION**

## I. Governing Law

### A. *CEQA—General Overview[3]*

CEQA "embodies a central state policy to require state and local governmental entities to perform their duties 'so that major consideration is given to preventing environmental damage.' [Citations.] [¶] CEQA prescribes how governmental decisions will be made when public entities, including the state itself, are charged with approving, funding—or themselves undertaking—a project with significant effects on the environment." (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 711–712, italics omitted.)

When the agency responsible for approving a proposed discretionary project finds substantial evidence that the project may have a significant impact on the environment, CEQA requires the agency to prepare and certify an EIR before approving the project. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1187; § 21100, subd. (a).) One purpose of the EIR "is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564.) "The [EIR] must include a description of the proposed project and its environmental setting and discussions of (1) the possible

---

[3] The facts and law applicable to the specific claims raised by petitioners and respondents are discussed as appropriate in connection with each claim.

environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a 'no project' alternative, and (4) the cumulative impact of the project's various environmental effects." (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627 (*County of Butte*).) In this way, an EIR serves "to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a).)

The CEQA process, however, "is not solely informational. It also plays a critical *regulatory* role, largely through the mechanism of mitigation measures." (*County of Butte*, *supra*, 13 Cal.5th at p. 642 (conc. & dis. opn. of Cantil-Sakauye, C.J.).) When an EIR concludes that a project, as proposed, will result in a significant environmental effect, the EIR must propose mitigation measures, which are "modifications of the proposed design and implementation of a project . . . to reduce the project's adverse environmental effects." (*County of Butte*, at p. 627; Guidelines, § 15126.4, subd. (a)(1)(A) [an EIR must "identify mitigation measures for each significant environmental effect identified in the EIR"].)[4] Once identified, the mitigation measures, if feasible, must be adopted by the lead agency as

---

[4] We will cite and refer to CEQA's implementing regulations, codified at title 14, division 6, chapter 3 of the California Code of Regulations, as the "Guidelines."

5

legally enforceable conditions of the project. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 524–525 (*Sierra Club*) [agencies are required to implement all feasible mitigation measures]; Guidelines, § 15126.4, subd. (a)(2) [mitigation measures must be made "fully enforceable" through "legally-binding instruments"].) Approving a project that omits a feasible mitigation measure constitutes an abuse of discretion. (*Sierra Club,* at p. 526.) A "feasible" mitigation measure is one that is "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364.)

When an agency concludes that a proposed project will result in an environmental effect that cannot be reduced to insignificance through the application of feasible mitigation measures, the project may not be approved unless the responsible agency makes an express finding that "specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (§ 21081, subd (b); *County of Butte*, at pp. 627–628.) But even when a project's benefits are found to outweigh its significant environmental effects, "agencies are still required to implement all mitigation measures unless those measures are truly infeasible." (*Sierra Club*, *supra*, 6 Cal.5th at pp. 524–525.)

## B. *Standard of Review*

"In general, judicial review of agency actions for CEQA compliance extends to 'whether there was a prejudicial abuse of

6

discretion.' " (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495 (*County of Stanislaus*).) " '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. [Citation.] Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

We " 'review[] the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' " (*County of Stanislaus*, *supra*, 10 Cal.5th at p. 495.)

## II. Mitigation of Railroad Impacts

Petitioners first contend that the EIR's plan for safeguarding ballpark visitors from rail traffic is, for three separate reasons, infeasible and ineffective.[5]

---

[5] The first claim petitioners purport to present is that the "EIR systematically deferred analysis and mitigation." The accompanying one-page argument, however, is conclusory and unsupported by citation to the record. We therefore disregard this argument, except as mitigation deferral is properly raised in

7

As noted, Howard Terminal is bounded on the north by railroad tracks that actively serve both passenger and freight lines. The tracks are unusual in that they run down the middle of a major street at grade. Traffic gates at intersections are the only barriers separating the tracks from Embarcadero West and its cross-streets. As the EIR explained, "[t]he railroad segment through Jack London District is unique in California in that passenger and freight trains operate within an urban street sharing the rail right-of-way with motor vehicles, bicycles, and pedestrians . . . . [R]ailroad crossing controls and protection are minimally provided at public street at-grade crossings but no features exist that preclude people from crossing mid-block or turning left across the railroad tracks even when crossing controls are activated." A study by the City found that an average of six freight trains and 36 passenger trains use the tracks daily between the hours of 11:00 a.m. and 11:00 p.m., the time period when fans will be attending baseball games. These trains thus present not only a safety hazard to persons visiting the ballpark, but also the risk that access to the site will be obstructed by passing trains.

To address these problems, the EIR proposed and the City adopted a series of mitigation measures, including the

---

connection with petitioners' other claims. (See, e.g., *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [disregarding " 'conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt' "].)

8

installation of fencing on both sides of the tracks for the length of the project site's frontage; the elimination of one intersection and the installation of enhanced safety features at the remainder; and the construction of two overcrossings, one for bicycles and pedestrians and a second for vehicles. Although these measures will improve existing conditions, the EIR found that the project will present significant and unavoidable environmental impacts because it will expose the vehicles and pedestrians expected to cross the tracks at the five remaining at-grade intersections to the safety hazards created by the railroad tracks.

### A. The Multi-Use Path

Petitioners contend that a portion of one of the measures proposed to mitigate railroad impacts is not feasible. As noted, the EIR requires fencing on both sides of the tracks to isolate the railroad corridor from traffic on Embarcadero West and thereby prevent crossing of the tracks between intersections. The proposed fence would start at the northwest corner of the site and extend two blocks beyond the northeast corner.

As part of this measure, the EIR anticipates that a three-block stretch of the southern lane of Embarcadero West would be closed to vehicle traffic and "physically separated from the railroad tracks by a fence to accommodate a multi-use path." The proposed location of the multi-use path, however, is within the right of way of the Union Pacific Railroad Company (UPRR), which operates the freight line on the tracks. During preparation of the EIR, UPRR told the City that "[n]o part of the railroad right of way may be used for the Project. UPRR is preserving the

9

full width of its right of way for future capacity needs and will not make any of it available for third-party development." The final EIR recognized that UPRR's stated position "would preclude the multi-use path described in the Draft EIR." Petitioners rely on UPRR's position and the City's concession in arguing that the multi-use path is not feasible.

The flaw in this argument is that the mitigation measure at issue is not the multi-use path. It is the fence. As discussed above, the EIR proposes to reduce safety risks by requiring construction of a fence on both sides of the railroad tracks to prevent pedestrians and vehicles from crossing them outside of intersections. The multi-use path is an aspect of the envisioned modification of Embarcadero West, but the path does not itself contribute to the fence's mitigation of safety hazards. Rather, the path appears to be simply an amenity. Indeed, the final EIR recognizes that the path would be located outside the fence, "between the fence and the existing buildings," where it would play little or no role in hazard mitigation.

Petitioners cite no law suggesting that the infeasibility of a single feature of a mitigation measure necessarily renders the entire measure infeasible. With or without a multi-use path, the fence will have the desired effect of precluding access to the tracks between intersections, and there is no evidence to suggest that loss of the path will reduce the effectiveness of the fencing. Further, the final EIR concludes that UPRR's position with respect to its right of way would not necessarily preclude construction of the fence, which is consistent with UPRR's

10

insistence that "[f]encing or similarly effective barriers must be constructed to prevent the public from entering the railroad right of way at unauthorized locations." Substantial evidence thus supports the City's conclusion that this mitigation measure is feasible.

### B. The Pedestrian and Bicycle Overcrossing

Petitioners next contend that the mitigation measure requiring construction of an overcrossing dedicated to pedestrians and bicyclists "will not be effective."

Construction of an overpass across Embarcadero West will, in theory, permit pedestrians and bicyclists to enter the project site without crossing the railroad tracks, thereby avoiding both the danger and delay posed by passing trains. In part to encourage use of the overpass, the EIR requires its installation to be accompanied by improvements to the surrounding streets and sidewalks "to provide a pedestrian path of travel between buildings and parking where no sidewalk exists today." The EIR anticipates that the overpass will be located near the northeast corner of the site, which is expected to receive about 60 percent of the fans entering the ballpark on game days, but a specific location was not determined because implementation of the overpass will be subject to the jurisdiction of the California Public Utilities Commission (CPUC). The EIR concluded that the overpass will serve between 3,000 and 6,000 persons during the peak hour on game days. It recognized, however, that although the overpass "would have the potential to improve safety and therefore reduce the severity" of the rail hazards, "some travelers

11

to and from the site would continue to use at-grade crossings" at Embarcadero West intersections.

Relying on a number of public comments criticizing the EIR's tentative placement of the overpass at Jefferson Street, a cross street toward the eastern end of the project site, and taking issue with the analysis in the technical study on which the tentative placement and design of the overpass was based, petitioners claim that "substantial evidence demonstrates" that the overpass will be ineffective.

Petitioners' contention misstates the applicable standard of review. The question before us is not whether substantial evidence supports a petitioner's critique of the EIR; it is whether substantial evidence supports the agency's conclusions. (*Sierra Club*, *supra*, 6 Cal.5th at p. 512 [" 'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument" ' "].)

The EIR concluded that the overpass would divert some 3,000 to 6,000 visitors from using at-grade crossings on game days, but it did not contend that the overpass—or, indeed, any proposed mitigation measures—would solve the unusual problems created by the at-grade railroad tracks running across the northern border of the project site. The City acknowledged this in adopting a statement of overriding considerations regarding these hazards, concluding that the project's benefits

12

outweighed the unmitigable hazards presented by the tracks. The EIR unquestionably contains substantial evidence to support a finding that the overpass will significantly mitigate the hazards by diverting thousands of visitors from at-grade intersections, but the adoption of a statement of overriding considerations makes clear that the City did not believe the risks will be entirely alleviated.

Petitioners are critical of the proposed placement of the overpass, but there does not appear to be an ideal location. None of the evidence cited by petitioners establishes that an alternative placement would, all things considered, be preferable, and the EIR provides rational reasons for its choice.[6] Because substantial evidence supports the conclusion that the tentative location identified in the EIR will have the mitigating effect explained in the EIR, we have no legal basis to second-guess the City. Moreover, precise placement of the overpass—and, indeed, its very existence—will be up to the CPUC, as the EIR acknowledges. The City recognized this uncertainty in citing the CPUC's authority as one basis for its adoption of a statement of overriding considerations with respect to rail hazards.

---

[6] The study on which the EIR relied considered four different overpass locations. Two were found infeasible. The EIR focused on the Jefferson Street location because it scored highest on all the factors evaluated by the study, was judged to be compatible with the existing City grid, and is close to a proposed transit hub on 2nd Street. But the mitigation measure also identifies Clay Street "or comparable nearby location" and leaves the decision to the project sponsor and the CPUC.

Petitioners cite *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362 (*City of Maywood*), which considered an EIR prepared in connection with a proposed new high school. (*Id.* at p. 371.) As proposed in the notice of preparation for the EIR, the project required the closure of 58th Street, a major street running through the proposed campus site. During the period of EIR preparation, however, the project was redesigned to incorporate a pedestrian bridge crossing the street, which would remain open to traffic. (*Id.* at p. 387.) Although the EIR addressed traffic safety, neither the project's consultants nor the draft EIR addressed the risks created by permitting 58th Street to divide the campus. (*Id.* at p. 388.) When the failure was pointed out in comments on the draft EIR, the final EIR "did not make any substantive changes to the [draft EIR's] subchapter on pedestrian safety. The [agency] also chose not to revise the pedestrian safety study to consider impacts associated with 58th Street and the pedestrian bridge." (*Id.* at p. 389.) The court found the EIR inadequate due in part to its failure to address safety impacts created by the change of plans regarding 58th Street. (*Id.* at pp. 395, 436.)

Petitioners point to no deficiency in the EIR's discussion of rail hazards comparable to the failure in *City of Maywood*. The EIR disclosed and addressed the risks presented by the rail tracks; petitioners merely criticize the thoroughness of the discussion and some of its conclusions. Our substantial evidence standard of review precludes these disputes from serving as a basis for reversal.

14

### C. *Failure to Consider Closure of Intersections*

Petitioners argue that the EIR failed to consider the temporary closure of Embarcadero West intersections during events at the ballpark as a means to mitigate the hazards associated with the railroad tracks. As respondents argue, this contention was not properly exhausted.

As noted, the EIR considered a series of physical changes to Embarcadero West and the surrounding streets to mitigate the hazards associated with the railroad tracks. At least two commenters suggested that the City should consider closing intersections as a further means of reducing those risks. The first suggestion was relatively summary. (Comment of RailPros ["The DEIR and appendix do not sufficiently address the potential for crossing closures to reduce impacts"].) The second comment, by the Capitol Corridor Joint Powers Authority (JPA), was more substantial. The JPA suggested that "[t]he only feasible mitigation for [the risk created by pedestrians crossing the railroad tracks] is a combination of grade separation or closure of the railroad crossings." It therefore urged the City to "study a combination of grade separation and *permanent* closure of all railroad crossings near and adjacent to the Ballpark," opining that "without a combination of grade-separation . . . and *permanent* closures at all five (5) railroad crossings . . . , the Project would be imprudent from our perspective." (Italics added.) After discussing grade separation in more detail, the JPA's comment devoted a paragraph to the claim that "the City is obligated to fully analyze an alternative involving *permanent*

15

closure of the five at-grade railroad crossings.  This alternative was impermissibly eliminated from full consideration in the [draft EIR]."  (Italics added.)

In a different portion of the letter, three pages later and in a section entitled, "Pedestrian and bicycle overcrossing," the JPA noted that it was uncertain how many fans would use the overpass because "[t]o use the overcrossing, users would need to first go up 26 feet and then down 26 feet," which might discourage some.  The comment continued, "At a minimum, measures to encourage use of the overcrossing will be necessary considering normal human proclivity to seek the fastest way from one side of the railroad tracks to another.  The most effective and safest way to preclude the possible use of at-grade crossings is by closing them, *whether temporarily or permanently*."  (Italics added.)

The final EIR addressed the permanent closure of the Embarcadero West intersections, finding it infeasible.  Closing these intersections, the final EIR noted, would turn portions of four of the crossing streets into cul-de-sacs, interfering with traffic patterns and isolating from vehicle access a wide variety of offices and businesses, boat slips, parking facilities, and a fire station.  Closing the fifth intersection would divide a "major street" connecting downtown Oakland with the waterfront, requiring "substantial changes to area circulation."  The EIR did not, as petitioners now urge, consider temporary closure of these intersections during ballpark events.

16

Our colleagues in Division Five recently summarized the CEQA exhaustion requirement: " ' "In order to attack a decision that is subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency . . . ." ' ' "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." ' [Citation.] This requirement is known as the exhaustion doctrine. [Citation.] The rationale behind this rule is that the public agency should have the opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review. [Citation.]' [Citation.] [¶] Generally speaking, ' " ' "bland and general references to environmental matters" ' " ' or ' " ' "isolated and unelaborated" ' " ' comments do not satisfy the exhaustion requirement; rather, the ' " ' "exact issue" ' " ' must have been presented to the agency. [Citations.] At the same time, courts have acknowledged less specificity is required to preserve an issue for appeal in an administrative proceeding than in a court proceeding because parties are not generally represented by counsel before administrative bodies . . . ." (*Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1104–1105.) In essence, "[t]o satisfy the exhaustion doctrine, the objections must 'fairly apprise[]' the agency of the purported defect in the EIR." (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 251.)

We agree with respondents that the single word "temporarily" in the JPA's comment did not fairly apprise the

City that the JPA was proposing temporary closure of the intersections as a mitigation measure independent of permanent closure. In so holding, we recognize that the JPA comment did suggest that "[t]he most effective and safest way to preclude the possible use of at-grade crossings is by closing them, whether temporarily or permanently." Yet in determining whether this mention fairly apprised the City of the issue, it is necessary to consider the context. This sentence came toward the close of a letter primarily faulting the City for failing to consider two specific mitigation measures: some form of grade separation at each of the intersections or the *permanent* closure of the intersections without grade separation. The comment discussed each of these issues at length in separate paragraphs, and each of the several mentions of closure referred specifically to "permanent closure" of the intersections. The final mention of "closing them, whether temporarily or permanently," which occurred three pages later in a separate portion of the letter, gives no indication that it was intended to refer to a mitigation measure different from that urged in the remainder of the comment. On the contrary, the single reference to temporary closure was an "isolated and unelaborated comment." (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 282.) Merely adding the word "temporarily" to a sentence that otherwise reiterated a point made several times in the comment was insufficient to fairly apprise the City that the JPA considered temporary closure to be an issue separate and apart from permanent closure.

18

Petitioners rely on *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019 (*Los Angeles Unified*), but that case is inapposite. In *Los Angeles Unified*, the City prepared an EIR addressing a proposed plan for development of a portion of the San Fernando Valley. (*Id*. at p. 1022.) The school district argued that the EIR failed to consider measures to mitigate the impact of increased air pollution on community schools, such as "the feasibility of air conditioning and filtering at the schools so the windows could be closed against the polluted air." (*Id*. at p. 1028.) There was no dispute that these mitigation measures were suggested by the school district in its comments on the EIR, and the city did not contend that the school district had failed to exhaust the claim. (*Id*. at pp. 1028–1029.) Further, there was no suggestion that the school district's comment was raised in a manner analogous to the JPA's single passing mention of temporary closings.

In sum, we are unpersuaded by petitioners' challenge to the EIR's discussion of railroad-related impacts and mitigation.

## III.   Displacement of Howard Terminal Activities

As approved, the project will displace all current activities at Howard Terminal and require their relocation. Petitioners contend the EIR did not adequately analyze the environmental consequences of this displacement.

### A.   *Seaport Parking Assumptions*

Petitioners first argue that the EIR's assumption that displaced overnight truck parking can relocate to nearby lots—an assumption made for the EIR's analysis of the impact of such

19

displacement on air quality—is not supported by substantial evidence.

The primary activities displaced by the project are parking for trucks and container storage, but Howard Terminal is also the site of a longshoreperson training facility, a vessel berth used for maintenance and storage, and facilities for truck repair. The project will require all these activities to find a new home. As the final EIR recognized, because the economic impact of displacement "is not in and of itself considered a significant impact for CEQA purposes," the EIR "is not required to identify potential relocation sites . . . as mitigation." (See Guidelines, § 15131, subd. (a); *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1120–1121 (*Gray*) ["Economic and social effects may be considered, but by themselves, are not treated as significant effects on the environment"].) To evaluate the environmental impact of displacement, however, the EIR *was* required to make reasonable assumptions about the manner in which relocation would occur.

In its discussion of the impact of displacement on local air quality, the EIR assumed that trucks currently parking at the project site would find sufficient alternative overnight parking within the Port. The assumption was premised on the findings of a 2020 study of overnight truck parking needs at the Port through the year 2050, which was included in a broader study of future Port activities (Seaport Forecast). Asked to update an earlier survey which found that 30 acres of truck parking space at the Port would be adequate for "foreseeable conditions," the

Seaport Forecast concluded that even assuming strong growth in Port traffic, overnight parking needs would continue to be accommodated on 30 acres through 2050.

Based on the Seaport Forecast, the EIR assumed that 30 acres of parking would be necessary to accommodate total overnight parking needs. The EIR located that acreage at two sites within the Port. The first was 15 acres at the "Roundhouse," an existing facility to the west of Howard Terminal that was already used for parking. The second site was 15 acres of then-unused space at the former Oakland Army Base (OAB), which was projected to open in 2021. The City had earlier committed to making the OAB site available for Port truck parking and ancillary maritime services in connection with the redevelopment of OAB. As the final EIR explained, the OAB facilities occupy 16.7 acres and would provide "a range of support services for trucking companies," including "areas for short-term and overnight truck parking." Because trucks currently parking at Howard Terminal should find sufficient overnight parking at one of these two locations, the EIR concluded, relocation of parking "would not create new or additional [air quality] impacts."

A comment by the Bay Area Air Quality Management District (BAAQMD) observed that the Roundhouse site is at capacity and, disregarding the EIR's reference to the OAB site, contended that "there are no known plans to develop new or additional parking facilities." CalTrans was similarly concerned that "there is a significant shortage in truck parking options" at

the Port already. Based primarily on these comments, petitioners argue that "there was no evidence that the combined acreage of the Roundhouse and OAB could absorb the parking uses displaced from Howard Terminal."

The Seaport Forecast provides the necessary substantial evidence to support the EIR's assumption. As the EIR explained, the Seaport Forecast concluded that overnight parking needs at the Port in 2050 would be accommodated by 30 acres of parking space. The EIR relied on the availability of the necessary 30 acres between the Roundhouse and the new OAB site to satisfy those needs. The Seaport Forecast supports the EIR's conclusion that, once the Howard Terminal parking facilities are closed, the anticipated demand for overnight parking at the Port can be satisfied by the combined acreage of these two facilities. Petitioners cite no evidence in the record that casts doubt on the conclusions of the Seaport Forecast regarding future parking needs. Therefore, combined with the EIR's recognition that the Roundhouse and OAB are expected to provide a total of 30 acres of parking, the Seaport Forecast provides substantial evidence to support the assumption that displaced parking can be accommodated elsewhere within the Port. (See, e.g., *City of Long Beach v. City of Los Angeles* (2018) 19 Cal.App.5th 465, 480–481 [projections by experts may constitute substantial evidence to support an EIR's assumptions].)

Petitioners argue that the commenters' observation that the Roundhouse is already at capacity casts doubt on the EIR's assumption that displaced parking can be accommodated by the

22

Roundhouse and the OAB sites, arguing that there is no evidence in the record that the OAB site can accommodate all trucks currently using Howard Terminal. As noted above, the EIR's approach to the analysis of future parking needs relied on the estimates of the Seaport Forecast, and the analysis was reasonable and supported by substantial evidence. Petitioners implicitly argue the EIR should have taken a different approach, calculating the acreage necessary to accommodate the current users of Howard Terminal parking, determining the available capacity at the Roundhouse, and adding to that the 15 acres of new capacity at OAB. The EIR certainly could have taken this approach, but it was not required to do so. (*Rodeo Citizens Assn. v. County of Contra Costa* (2018) 22 Cal.App.5th 214, 226 [" ' "CEQA gives lead agencies discretion to design an EIR . . . ." ' "].)

If there were evidence in the record suggesting that the newly available space at OAB is inadequate to accommodate the parking displaced from Howard Terminal, petitioners' argument might have more force. The comments relied on by petitioners, however, disregarded entirely the EIR's reference to the OAB site, commenting only that Roundhouse had no additional capacity.[7] But even if this is true, the OAB site will provide 15 acres of space to absorb parking displaced at Howard Terminal. Neither the comments on which petitioners rely nor any other

---

[7] We note that one of the comments cited by petitioners undermines their contention that the Roundhouse is already at full capacity.

23

evidence in the record suggests that the parking needs created by the closure of Howard Terminal cannot be accommodated at the new OAB site.

Petitioners also argue that the study is a "projection of future parking needs" that "does not address the current parking capacity at the Port, nor does it guarantee that any space will be available at the Roundhouse (or for that matter at the OAB) when activities are displaced from Howard Terminal." (Italics omitted.) While this is literally true, the projected future needs in 2050 can reasonably be assumed to exceed present needs. Even if the Roundhouse is currently at capacity, the OAB site provides an additional 15 acres of parking space, and there is no evidence in the record to suggest the OAB site is presently full or will be filled during the relevant time.[8]

## B. *Impacts of Relocation Outside the Port*

Petitioners contend that the EIR inadequately analyzed air quality impacts because it declined to consider the impact of current Howard Terminal users, primarily parking tenants, that will relocate outside the Port.[9] The EIR disregarded such

---

[8] The fact that the Roundhouse might be converted to another use at some point in the future, as petitioners also argue, is speculative, as there is nothing in the record to suggest that the Roundhouse will be converted to other uses in any foreseeable time period.

[9] All current activities at Howard Terminal will be required to relocate. In general terms, petitioners fault the EIR for disregarding the air quality impact of this relocation, but their analysis focuses exclusively on the impact of relocated truck parking. Given the absence of evidence that the relocation of

impacts because it concluded that attempting to analyze such relocation was speculative.

The EIR contained two separate analyses of the project's impact on air quality, differing in the geographic area over which the impacts were measured. The first of these analyses addressed the impact of the project on air quality in the immediate vicinity of the project site and assumed that all displaced parking would relocate to the Roundhouse, which is nearly adjacent to the project site. This assumption was selected because it presented a " 'worst case' scenario for purposes of the health risks associated with [toxic air contaminants] emissions" in the immediate area. The failure to analyze the impact of parking displaced to locations outside the Port could not have had a material impact on this analysis, and petitioners do not appear to contend otherwise. Any diversion of parking activities to more distant locations would reduce the project's localized environmental impact.[10]

The second analysis considered the impact of the project on air quality in the San Francisco Bay Area Air Basin, which includes Alameda and eight nearby counties. In discussing pollutant emissions associated with existing users of Howard Terminal, the EIR noted that it did not subtract these emissions

other activities will have a measurable impact on air quality, we, like petitioners, focus on parking.

[10] In this connection, petitioners contend that the EIR erred in subtracting emissions from eliminated Howard Terminal activities in the analysis of localized impacts. Because those activities are displaced to other locations within the Port, however, we find no error in this approach.

from the analysis, despite their need to relocate, because it assumed the activities would continue to occur elsewhere in the greater Bay Area, even if not at the Port itself. Further, the analysis did not consider any additional emissions that might be associated with the relocation of these activities outside the Port because, as the final EIR explained, "it is unknown where the tenants would relocate to if they do not stay within the Seaport." The final EIR characterized these possible changes as "speculative," given the difficulty of predicting how current users of Howard Terminal services would respond to the displacement.

Petitioners dispute the EIR's characterization of parking relocation as speculative and argue that it should have been considered because longer distances traveled by relocated truckers might generate greater emissions.

Specifically with respect to truckers who elect to relocate outside the Port, the final EIR explained that "the lack of specific and reliable information sources on where existing truck parking tenants would locate to makes any assumptions of relocation areas speculative. . . . Surveys of existing tenants and drivers could not be utilized because the information would not be reliable or static, as tenants and drivers change over time, responses would not be binding or capable of confirmation, and could change before the start of Project construction/lease termination if the Project is approved. In addition, this is a dynamic industry with a mix of large trucking companies, small trucking companies, and independent owner-operators that frequently change their business operations in response to

26

market conditions and other factors." Particularly given the availability of alternative parking within the Port, we find the EIR's conclusion that there is no reliable method to determine the number of truckers who will elect to relocate or the site of their eventual relocation to be reasonable and supported by the administrative record.

When the environmental impact from a particular project feature cannot be reliably ascertained and estimated, it is properly characterized as speculative. In *Rodeo Citizens Assn. v. County of Contra Costa, supra,* 22 Cal.App.5th 214, for example, a refinery sought approval to install equipment that would permit the refinery to capture and sell butane and propane as a byproduct of its operations. (*Id.* at pp. 217–218.) The petitioner contended that the EIR prepared in connection with the permit approval was inadequate because it failed "to quantify the greenhouse gas emissions from the downstream uses of the recovered propane and butane." (*Id.* at p. 226.) The court held that the agency properly declined to analyze these emissions as speculative. (*Id.* at pp. 226-227.) As the court explained, it could not be assumed that the propane and butane would be burned because these chemicals have significant non-fuel uses. (*Id.* at p. 227.) Further, because of changing market conditions, "historical market data would be an unreliable predictor of the future" regarding the manner in which the butane and propane would be used. (*Ibid.*) As a result, the court held, "the lead agency reasonably determined that further analysis of the

27

potential impacts was impractical and not required." (*Id.* at p. 228.)

*Rodeo Citizens* is illustrative here. As previously noted, the EIR reasonably determined that sufficient parking would be available near the project site to accommodate the displaced trucks. (Section III.A, *ante*.) Although the EIR recognized the likelihood that some truck parking might nonetheless relocate outside the Port, it concluded that the extent and character of relocation could not be reliably determined at this time and any attempt to estimate the extent of relocation was, therefore, speculative. For the reasons stated above, we find substantial evidence to support that conclusion.

## IV.   Air Quality Analysis

### A.   *Emergency Generator Emissions*

Petitioners contend that the EIR's analysis of emissions from emergency electricity generators at the project site was inadequate.

The EIR's air quality analysis "conservatively" assumed that the project would include 17 new emergency generators, one each at the ballpark and the mixed-use buildings. The analysis assumed that these generators would run for 50 hours per year, a figure chosen because it represented the maximum time allowed by California regulations for annual testing and maintenance of such generators. To limit emissions from the generators, the EIR included a mitigation measure restricting their annual testing and maintenance to a maximum of 20 hours, 30 hours less than the maximum permitted.

28

An EIR comment contended that the estimated time for operation of the generators should have been 150 hours, based on a Bay Area Air Quality Management Board (BAAQMD) policy document that presumes, in determining the applicability of certain agency regulations, 100 hours of annual generator use in addition to the time for testing and maintenance. The policy explained that "100 hours represents a reasonable worst-case assumption regarding the amount of time during any given year that a facility could have to operate without outside power."

The final EIR rejected the claim that it should follow the BAAQMD model, asserting that the EIR was required only to assess "emissions which occur on an annual basis," not " 'emissions that will only occur infrequently when emergency conditions arise.' . . . The annual hours of operation used in the Draft EIR are based on reasonably foreseeable future hours of operations, not on the hypothetical maximum hours of operation used for permit regulatory purposes." The final EIR recognized that regular power shutoffs, requiring the predictable use of generators, do occur during times of wildfire risk in parts of the Bay Area that are designated "high fire risk areas." The project site is not so designated.

Petitioners characterize the EIR as assuming the generators would operate for 50 hours of testing and maintenance annually, while allocating no time for actual emergency use, and argue that this assumption was unreasonable. We find no inadequacy in the EIR's analysis of this issue.

" 'CEQA requires that an EIR make "a good faith effort at full disclosure." [Citation.] "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences." ' " (*Save the El Dorado Canal v. El Dorado Irrigation Dist.* (2022) 75 Cal.App.5th 239, 264 (*El Dorado*.)  An EIR "is required to study only reasonably foreseeable consequences of" a project. (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 125.)  "CEQA does not require an agency to assume an unlikely worst-case scenario in its environmental analysis." (*Id.* at p. 126.)

The final EIR accurately characterized the City's burden: To analyze the reasonably foreseeable operation of the emergency generators. (*El Dorado, supra*, 75 Cal.App.5th at p. 264.)  For that reason, if the annual need for emergency generator use is reasonably foreseeable, the EIR was not entitled to disregard such use merely because it would occur at unpredictable times. The EIR acknowledged as much in recognizing the foreseeability of annual power shutoffs in high fire risk areas.  And as petitioners argue, it is likely that power shutoffs will occur at some point during the assumed 30-year life of the project's buildings, requiring use of the generators.  Neither the EIR nor petitioners, however, identify any circumstances that make regular emergency use of the generators reasonably foreseeable at the project site.  Petitioners merely argue the obvious—that

30

"shutoffs necessitating use of the emergency generators could occur for reasons other than fires."

Yet even if some annual emergency use of the generators is reasonably foreseeable, we are inclined to conclude that the EIR made appropriate allowance for such use. Its adoption of 50 hours as an appropriate estimate of annual running time was based on the maximum time *permitted* for testing and maintenance under California regulations. The time actually necessary for testing and maintenance is presumably somewhat less than this maximum, as reflected in the EIR's adoption of a mitigation measure allowing only 20 such hours of use. The EIR's estimate of 50 hours of annual operating time therefore included a cushion of 30 hours for emergency operation. Although the EIR did not purport to allot time for emergency operation, its analysis, as a practical matter, appears to have done so.

We are not persuaded otherwise by petitioners' citation to the BAAQMD policy. As the policy document states, its estimate of 100 hours is a worst-case assumption that is applicable throughout the Bay Area. As noted in the EIR, some parts of the Bay Area are subject to predictable, sustained power outages undertaken to reduce the risk of fire, and BAAQMD's generally applicable assumption was presumably calculated to take such outages into account. The EIR was required to make neither a generally applicable nor a worst-case assumption; rather it was required to make a reasonable estimate of likely annual use of the generators at the project site. It did so.

## B.  Greenhouse Gas Mitigation

Petitioners contend that the EIR improperly deferred mitigation of the project's greenhouse gas (GHG) emissions.

As the EIR recognized, Assembly Bill No. 734 (Stats. 2018, ch. 959, § 2), a state law enacted to speed judicial review of any CEQA challenge brought in connection with the project, requires the City to incorporate various measures to reduce GHG emissions and prohibits the project from causing "any net additional emissions of greenhouse gases." (§ 21168.6.7, subds. (a)(3)(A)(ii), (b), (d)(3); see generally, *Pacific Merchant Shipping Assn. v. Newsom* (2021) 67 Cal.App.5th 711, 719–720 [addressing § 21168.6.7].)  Consequently, as a standard for finding no significant environmental impact from GHG emissions, the EIR required that the project emit, over its 30-year life, no net additional GHGs than are currently emitted in connection with the A's activities.  The EIR's environmental impact analysis concluded that, without mitigation, the project would fail to meet this standard, producing substantial net additional emissions annually throughout its 30-year projected lifespan.

To reduce GHG emissions to the significance standard of no net additional emissions, the EIR adopted a single mitigation measure.  Mitigation Measure GHG-1 prohibits the City from approving any construction-related permit for the project unless the project sponsor has "retain[ed] a qualified air quality consultant to develop a Project-wide GHG Reduction Plan" that "shall specify anticipated GHG emission reduction measures

32

sufficient to reduce or offset these emissions . . . , such that the resulting GHG emissions are below the City's 'no net additional' threshold of significance."

Mitigation Measure GHG-1 describes in detail the contents of the required emissions reduction plan, including the manner in which emissions are to be measured and estimated. Emission reduction measures must be specified separately for each project phase and must be "verifiable and feasible to implement," and the plan is required to identify the person or entity responsible for monitoring each reduction measure. The plan must incorporate the EIR's air quality mitigation measures and must adopt other on-site and off-site emissions reduction measures from a detailed, five-page list as necessary to meet the significance standard. In addition to these specific emissions reduction measures, Mitigation Measure GHG-1 identifies several other written sources for other possible GHG reduction measures.

Further, the mitigation measure provides detailed instructions for implementing and monitoring the plan, including requiring an annual report summarizing the plan's implementation and compliance. The plan must be updated at each phase of development, demonstrating with each update that the goal of no net additional emissions has been met.

"The general rule is that an EIR is required to provide the information needed to alert the public and the decision makers of the significant problems a project would create and to discuss currently feasible mitigation measures." (*Sierra Club, supra,* 6 Cal.5th 502, 523.) Prior to 2019, the Guidelines generally

prohibited the deferral of mitigation measures, stating that "[f]ormulation of mitigation measures should not be deferred until some future time. However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." (Former Guidelines § 15126.4, subd. (a)(1)(B); see Cal. Code Regs., tit. 14, § 15126.4, Register 2010, No. 8 (Feb. 19, 2010), p. 690.) By the time the EIR was circulated in 2021, the guidelines had been amended to permit an agency to develop the "specific details of a mitigation measure" after project approval "when it is impractical or infeasible to include those details during the project's environmental review."[11] (Guidelines, § 15126.4, subd. (a)(1)(B) (Section 15126.4).) In such circumstances, deferral of mitigation details is permitted if the agency "(1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure." (§ 15126.4, subd. (a)(1)(B); see *Save Our Capitol! v. Department of General Services* (2022) 85 Cal.App.5th 1101, 1134 (*Save Our Capitol!*).)

Because petitioners do not challenge the City's implicit conclusion that it was impractical or infeasible to formulate the details of the GHG mitigation measure at the time the EIR was

---

[11] See Cal. Code Regs., tit. 14, § 15126.4, Register 2019, No. 2-Z (Jan. 11, 2019), p. 78.

prepared, we evaluate the GHG mitigation measure under the standards established by Section 15126.4.[12]

Mitigation Measure GHG-1 satisfies the three requirements of Section 15126.4. First, there is no question that the EIR commits the City to the mitigation measure. By its terms, the measure prohibits the approval of any permit allowing the project sponsor to proceed with construction until the GHG mitigation plan is formulated. The same requirement applies with respect to the updates required prior to commencement of subsequent phases of the project; no phase can proceed without an appropriate update. To assist in the City's "review and approval of the Plan" and the updates, the City is required to retain a "third-party expert," paid for by the project sponsor. And of course, compliance with the no net additional emissions standard is mandated by statute. (§ 21168.6.7, subd. (b).)

Second, Mitigation Measure GHG-1 adopts a specific performance standard that the mitigation will achieve: The requirement in Assembly Bill No. 734 that the project will result in no net additional GHG emissions above those generated by the current activities of the project sponsor.[13] The EIR describes in detail the manner of calculating existing GHG emissions from the

---

[12] Interpreting of the requirements of Section 15126.4, subdivision (a)(1)(B) is an issue of law that we review de novo. (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

[13] As the EIR states, "The net additional GHG emissions associated with the proposed Project is defined as the difference in emissions between the A's related existing emissions and the Project's total operational emissions, including construction emissions amortized over the lifetime of the Project."

35

project sponsor's current activities and quantifies these emissions. In 2018, the baseline year, the activities resulted in the emission of 8,580 million tons of carbon dioxide annually. Holding project GHG emissions below this level is therefore the specific performance standard the project must meet.[14] In addition, the EIR's analysis quantifies the GHG emissions that are expected from the project in the absence of mitigation, with any amount above the 8,580 million ton baseline constituting the quantitative target for GHG emission reductions.

Third, Mitigation Measure GHG-1 "identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will be considered, analyzed, and potentially incorporated in the mitigation measure." (§ 15126.4, subd. (a)(1)(B).) Mitigation Measure GHG-1 first sets out a series of reduction measures that *must* be incorporated into the plan, including adoption of the EIR's air quality and transportation mitigation measures, gold certification from the United States Green Building Council for the ballpark and all subsequent buildings, extensive electric vehicle charger installation, and electrification of at least 50 percent of all residential units. In addition, the project sponsor is required to include an extensive series of further reduction measures "as necessary to meet the requirements of this mitigation measure," including specific on-site measures to reduce emissions from operations,

---

[14] The maximum permitted emissions are actually adjusted downward over time to account for predicted reductions in emissions caused by increased carbon efficiency.

36

transportation, solid waste, water and wastewater, and landscaping, and off-site measures to reduce energy and transportation emissions and increase carbon sequestration. Mitigation Measure GHG-1 also identifies several written sources for other potential reduction measures.

Petitioners recognize the general rule articulated by Section 15126.4, but they argue that the EIR's mitigation measure does not commit the City to a "*specific* performance standard," citing *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70 (*Communities*), and they otherwise fault Mitigation Measure GHG-1 as inadequate.[15]

The project proposed in *Communities* was the addition of new equipment to a petroleum refinery. (*Communities, supra,* 184 Cal.App.4th at pp. 76–77.) The draft EIR recognized that the project could result in a net increase in GHG emissions of nearly 1 million tons per year, but both the draft and final EIRs declined to find this effect significant. (*Id.* at p. 90.) In response to

--------

[15] We recognize that *Communities* was decided under the earlier version of Section 15126.4, which generally prohibited deferral of mitigation, while the current version expressly authorizes deferral of mitigation details. Although the guideline amendment was intended to codify judicial decisions regarding mitigation deferral, only some of these decisions had been issued at the time *Communities* was decided, and the factors enumerated in the current guideline had not been articulated in those decisions in precisely the same way that they were adopted in the amended guideline. (See California Natural Resources Agency, Final Statement of Reasons for Regulatory Action, Amendments to the State EQA Guidelines, OAL Notice File No. Z-2018-0116-12, November 2018, at pp. 43–45.) In any event, all parties agree that *Communities* remains valid law.

37

vigorous public objection, the agency issued an amended EIR finding the increase in emissions to constitute a significant environmental impact and adopting a mitigation measure requiring the project sponsor, within a year after project approval, to "submit to the City, for approval by the City Council, a plan for achieving complete reduction of GHG emissions up to the maximum estimated . . . GHG emissions increase over the [existing level]." (*Id.* at p. 91.) The mitigation measure required the sponsor to consult an independent expert in formulating the plan and listed "a handful of cursorily described mitigation measures for future consideration that might serve to mitigate" the emissions. (*Id.* at pp. 92–93.)

*Communities* held the mitigation measure inadequate for several reasons. First, the court noted that "reliance on tentative plans for future mitigation after completion of the CEQA process significantly undermines CEQA's goals of full disclosure and informed decisionmaking." (*Communities*, *supra*, 184 Cal.App.4th at p. 92.) The court also faulted the content of the mitigation measure, explaining that "the final EIR merely proposes a generalized goal of no net increase in greenhouse gas emissions," with a list of possible mitigation measures that were "nonexclusive, undefined, untested and of unknown efficacy." (*Id.* at p. 93.) Moreover, the court noted that "[t]he only criteria for 'success' of the ultimate mitigation plan adopted is the subjective judgment of the City Council, which presumably will make its decision outside of any public process a year after the Project has been approved." (*Ibid.*) In short, "the lead agency . . . delayed

38

making a significance finding until late in the CEQA process, divulged little or no information about how it quantified the Project's greenhouse gas emissions, offered no assurance that the plan for how the Project's greenhouse gas emissions would be mitigated to a net-zero standard was both feasible and efficacious, and created no objective criteria for measuring success." (*Id.* at p. 95.)

We decline petitioners' invitation to construe *Communities* as holding that all mitigation measures finalized after project approval are invalid. As a threshold legal matter, Section 15126.4, subdivision (a)(1)(B) now expressly states that "specific details of a mitigation measure . . . may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review," provided the agency meets the conditions discussed above. The guideline did not contain that authorization at the time *Communities* was decided. The question under Section 15126.4 in its current iteration is therefore whether the conditions specified in the guideline are met, not whether delayed finalization is permitted at all. (See, e.g., *Save Our Capitol!*, *supra*, 85 Cal.App.5th at p. 1134 [recognizing that CEQA "authorizes relying on a future plan as a mitigation measure" if the guideline's requirements are met]; *King & Gardner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 856 (*King & Gardner*) ["the general rule is not absolute and ' "there are circumstances in which some aspects of mitigation may appropriately be deferred" ' "].)

Relying on *Communities* and *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 736, 739–740 (*POET*), petitioners also argue that "no net increase" can never be an acceptable performance standard. Again, we disagree. The mitigation measure rejected in *Communities* was not inadequate because it required no net increase in GHG emissions. Rather, it failed to meet the requirement of a specific performance standard because the mitigation measure called for a plan that would limit increases in GHG emissions by an amount "up to" no net additional emissions, with the ultimate acceptable reduction left to the discretion of the City Council. (*Communities, supra,* 184 Cal.App.4th at pp. 91, 93.) As a result, the only enforceable requirement in the mitigation measure was that the plan reduce GHG emissions to a level that satisfied that body's "subjective judgment." (*Id.* at p. 93.) *Communities* therefore accurately labeled the purported standard as merely a "generalized goal." (*Ibid.*)

In contrast, Mitigation Measure GHG-1 requires a plan that will *achieve* no net additional emissions, a standard chosen because it reflects the statutory requirement of Assembly Bill No. 734. Because the current level of emissions is known, quantified, and reported in the EIR, the requirement of "no net additional emissions" is, in practice, no different from a quantitative cap on emissions set at the current level. A quantitative cap is surely a specific performance standard, unlike the non-binding, generalized goal of *Communities*.

The adoption of a clear standard reflects the City's commitment to achieving the mitigation required by Assembly Bill No. 734. Again, this contrasts with the hesitancy of the lead agency in *Communities*, demonstrated by its initial resistance to finding the increased GHG emissions to constitute a significant environmental impact and its half-hearted adoption of mitigation, which left enforcement to the discretion of the City Council. (*Communities*, *supra*, 184 Cal.App.4th at p. 93.) There is no reason to doubt the City's commitment to achieving the statutory standard. Mitigation Measure GHG-1 requires nearly constant reporting, updating, and evaluation of the plan to ensure that it achieves the necessary emissions reduction.

Importantly, again in contrast to the EIR in *Communities*, Mitigation Measure GHG-1 did not merely suggest for consideration a handful of vague measures of uncertain efficacy. As noted, it listed and fully described five pages of detailed measures, some of which are mandatory and all of which must be implemented if necessary to prevent additional emissions. It is not the case, as suggested by petitioners, that the EIR leaves specific mitigation measures to future determination. Rather, as permitted by Section 15126.4, subdivision (a)(1)(B), the mitigation measure leaves only the "specific details of a mitigation measure" for later determination. In short, the mitigation measure represents a good-faith attempt to ensure no increase in GHG emissions while coping with the uncertainties created by years of construction, development, and the anticipated evolution of GHG reduction technology.

41

*POET*, *supra*, 218 Cal.App.4th 681, does not compel a different result. *POET* was a CEQA challenge to the state Air Resources Board's (ARB) formulation of low carbon fuel standards regulations. (*Id*. at p. 697.) As part of those regulations, ARB sought to promote the use of biodiesel fuel. (*Id*. at p. 732.) Although recognizing that combustion of biodiesel creates a greater amount of nitrogen oxides ($NO_x$) than ordinary diesel, in its proposed regulations, ARB staff " 'assumed' " there would be no increase in $NO_x$ emissions because " 'staff is currently conducting an extensive test program for biodiesel and renewable diesel and will follow that effort with a rulemaking to establish specifications to ensure there is no increase in $NO_x$.' " (*Ibid*.) The ARB therefore deferred final rulemaking regarding use of biodiesel. (*Id*. at p. 733.)

Citing *Communities*, the *POET* court concluded that ARB's statement that "future rulemaking will 'establish specifications to ensure there is no increase in $NO_x$' " failed to articulate "specific performance criteria," as required by CEQA. (*POET*, *supra*, 218 Cal.App.4th at pp. 739–740.) As the court explained, the statement "established no objective performance criteria for measuring whether the stated goal will be achieved. As a result, we and members of the public have not been informed how ARB will determine that the requirements it adopts in a fuel specifications regulation will ensure that use of the biodiesel does not increase $NO_x$ emissions. To illustrate this point, it is unclear what tests will be performed and what measurements will be

42

taken to determine that biodiesel use is not increasing NO$_x$ emissions." (*Id.* at p. 740.)

Unlike the proposed regulations in *POET*, Mitigation Measure GHG-1 provided far more than a bare promise that future mitigation would ensure there is no increase in GHG emissions. It set a quantitative standard as a baseline, required the project sponsor to meet that baseline, specified the manner in which compliance with the baseline would be measured, established strict reporting requirements, and specified a variety of measures that must be adopted as necessary to meet the standard. These features distinguish the mitigation measure from the statement in *POET* and, for the reasons discussed above, satisfy the requirements of Section 15126.4.

## V. Analysis and Mitigation of Hazardous Materials

Petitioners contend, for several reasons, that the EIR's analysis of the presence of hazardous materials at the project site and its measures for remediating those materials are inadequate.

### A. *Discussion of Existing Conditions*

Petitioners initially argue that the EIR's discussion of the presence of hazardous materials at the project site is insufficient. A proper analysis of existing environmental conditions is necessary to provide a baseline against which the likely effects of the project can be compared and quantified. (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 217.)

Concern over hazardous materials at Howard Terminal did not begin with the project. "[T]he Project site has a long history

43

of industrial use that has resulted in the contamination of fill, soil, and groundwater.  Various investigations, cleanup actions, and land use restrictions have been implemented to address the contamination."  Most of Howard Terminal is an active cleanup site subject to the ongoing oversight of the state Department of Toxic Substances Control (DTSC).

In discussing the prevalence of hazardous materials, the EIR relied, in addition to extensive past investigation reports, on a consultant survey conducted in 2019 (site investigation) that "sampled soil gas, soil, and groundwater throughout the entire Project site for chemicals of concern (COCs) identified in the previous investigations," including total petroleum hydrocarbons (TPH) and other contaminants.  The conclusions of the site investigation were then used to prepare a human health and ecological risk assessment (health risk assessment).  The health risk assessment evaluated potential human exposure to each COC at the project site, determined the maximum exposure to each that could be anticipated without mitigation, and evaluated the health risks associated with such exposure.  Based on this analysis, the health risk assessment established "target cleanup levels" to guide the remediation of each COC.  Both the site investigation and the health risk assessment were reviewed by DTSC, revised according to the agency's comments, and approved by DTSC.  The health risk assessment was, in turn, intended to provide the basis for formulating a remedial action plan (RAP) for the project that would reduce COCs below the target levels identified in the health risk assessment.  The RAP was not

44

complete at the time of the draft EIR, but a mitigation measure required its completion and approval by DTSC before the project could proceed.

### 1. Cap penetration

Petitioners first assert that the project description was inadequate because it failed to discuss separately the effect of removing the concrete cap that prevents the escape of existing soil contaminants. Petitioners theorize that "[b]reaking through the caps has the potential to mobilize existing contaminants below."

As respondents argue, the EIR's entire discussion of hazardous substances is, in effect, a discussion of the risks associated with cap penetration. Without penetration of the cap, which is necessary for any construction to occur, those substances would remain sealed in the soil and would not present a public health risk. The EIR fully recognizes the importance of the cap, explaining that the site is subject to land use covenants that prohibit any use "that will disturb or interfere with the integrity of the existing cap" unless a risk management plan, a health safety plan, and a soil management plan have been prepared and approved by DTSC prior to the disturbance. To the extent petitioners' contention concerns the risks associated with the spread of contaminated soil through construction activities, we note that the EIR contains a full discussion of the risk management measures already in effect at the site, which are triggered by "any construction activity at the Project site that would include breaching of the existing cap." In short,

45

petitioners' claim relating to the cap provides no basis for finding the EIR inadequate.

## 2. Failure to discuss HOPs

Petitioners also contend that the EIR's description of hazardous chemicals is deficient for failing to discuss the presence of a group of chemicals called "hydrocarbon oxidation products" (HOPs). These chemicals result from the degradation of hydrocarbons in the soil, but they can be detected and measured separately from hydrocarbons. The EIR noted that HOPs had been detected in several wells at a parcel adjacent to the project site "at concentrations that exceed the saltwater ecotoxicity ESL [environmental screening level]" and that the highest concentrations of HOPs were found in wells near the border with the project site. Despite this observation, HOPs were not separately discussed in the description of hazardous chemicals at the project site.

A comment on the draft EIR faulted the EIR and health risk assessment for failing to consider the presence of HOPs. According to the comment, a 2018 report prepared in connection with the ongoing monitoring and remediation of Howard Terminal (2018 Report)[16] "recognized HOPs as a contaminant of concern and stated that HOPs should be analyzed during future sampling events." Responding to this comment, the final EIR stated, "potential exposure from [HOPs] is evaluated by the

---

[16] Baseline Environmental Consulting, *Final Third Five-Year Review Report, Charles P. Howard Terminal*, Oakland, California, January 2018.

46

inclusion of TPH in the gasoline, diesel, and motor oil ranges, along with constituents of these mixtures (e.g., benzene and naphthalene) in the [health risk assessment]." This response was based on a report from the consultant that performed the site investigation and prepared the health risk assessment, which stated that "no significant [COCs] have been omitted from the [health risk assessment]" because HOPs were reported through inclusion within the TPH category.

The 2018 Report sheds light on this issue. Contrary to petitioners' interpretation of the comment, the 2018 Report did not identify HOPs as a COC separate from TPH. Rather, in discussing the manner in which total extractable petroleum hydrocarbons (TEPH) had been measured for purposes of the report, it noted that the test had used a process called "silica gel cleanup" (SGC). According to the 2018 Report, the SGC process had recently been found by the San Francisco Bay Regional Water Quality Control Board (Regional Board) to remove HOPs, which would otherwise be measured by the TEPH test, from a tested sample. For that reason, the 2018 Report noted, "TEPH measured after the application of SCG may reduce the apparent magnitude of the risks associated with petroleum product and their metabolites. . . . TEPH analysis with and without SGC will be used in biennial groundwater sampling from now on to provide comparable results to the historic data." (2018 Report, at pp. 21–22.) The site investigation, on which the EIR relied, recognized the problem and, to avoid any confusion, reported TPH levels before and after SGC treatment.

47

Understood in light of the 2018 Report, the site investigation's explanation of its TPH analysis provides substantial evidence to support the final EIR's rejection of the claim that the EIR failed to report the presence of HOPs on the project site. The presence of HOPs was included in the TPH measurements prior to treatment with SGC. For this reason, the EIR did not fail to disclose the presence of HOPs, any more than it failed disclose the presence of gasoline or any other individual chemical component of TPH that was not reported separately from the overall measurement.

It is a separate question, however, whether the environmental impact of HOPs is sufficiently distinct from that of hydrocarbons such that HOPs should have been separately measured and discussed by the EIR. This is a complex regulatory question that would seem to depend on a variety of factors, including the toxicity, prevalence, persistence, and behavior of HOPs in the soil relative to that of hydrocarbons, and whether HOPs require remediation techniques different from those used for hydrocarbons.

Although there is evidence in the record demonstrating that HOPs are soluble in groundwater, there is otherwise little to suggest that HOPs present an environmental risk sufficiently distinct from that of hydrocarbons as to require their separate reporting and discussion. (See *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 299 (" ' "The party challenging the EIR . . . bears the burden of demonstrating that the studies on which the EIR is based 'are

48

clearly inadequate or unsupported" ' "].) Petitioners' argument relies heavily on the publication by the Regional Board of an ESL for HOPs. As the Regional Board has explained, however, its ESLs "provide conservative screening levels for over 100 chemicals found at sites with contaminated soil and groundwater. They are intended to help expedite the identification and evaluation of potential environmental concerns at contaminated sites. . . . Information provided in [the ESL] documents is not intended to establish policy or regulation."[17] In other words, the existence of a Regional Board ESL merely suggests that a substance is a *possible* subject of environmental concern. It is not a confirmation of such concerns. Accordingly, we find little evidence in the record to suggest that HOPs are of sufficient environmental concern as to require consideration separate from TPH.

Importantly, the EIR's decision not to analyze HOPs separately from TPH is supported by the judgment of DTSC, the regulatory body with authority over the Howard Terminal cleanup. DTSC reviewed the site investigation and health risk assessment. Although DTSC's comments on the site investigation recognized the problem created by using SGC in measuring TPH, the agency did not recommend separate reporting of HOPs. That the DTSC did not require separate reporting of HOPs provides substantial evidence supporting the

---

[17] See "Environmental Screening Levels" on the Regional Board's website at <https://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/esl.html> [as of March 30, 2023].

City's adoption of the EIR notwithstanding its failure to separately assess the impact of HOPs. (See Guidelines, § 15384, subd. (b) ["Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts"]; *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397 ["the decisionmaker is 'permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others' "].)[18]

## B.    *Timeliness of the Health Risk Assessment*

Petitioners next argue that the health risk assessment is based on an ecological risk assessment prepared in 2002, which they contend is "outdated" because it predates the recognition of HOPs as a pollutant requiring consideration separate from TPH. This contention is governed by our conclusion, stated above, that the EIR's decision not to treat HOPs as a pollutant separate from TPH is supported by substantial evidence. Further, as noted, the health risk assessment used information generated by the site investigation, which separately reported TPH figures before and after SGC treatment.

---

[18] Petitioners also contend that the draft EIR understated the extent of HOPs contamination in groundwater at the project site because a map showing areas of groundwater contamination was based on TPH results after SGC treatment. Because we conclude that the City's decision not to separately discuss HOPs is supported by substantial evidence, we decline to rule that the EIR was required to report TPH results before SGC treatment. As noted, the TPH results were reported both ways in the site investigation, on which the map in the EIR was based.

## C. *Recirculation of the Draft EIR*

Petitioners next contend that the draft EIR failed to provide sufficient information about remedial measures that will be taken to minimize risk from soil and groundwater contamination at the project site and argue that the draft EIR should have been recirculated to disclose and discuss the remedial measures proposed in the draft RAP, which was completed after issuance of the final EIR. (§ 21092.1; *Residents Against Specific Plan 380 v. County of Riverside* (2017) 9 Cal.App.5th 941, 964 [under section 21092.1, when a lead agency adds "significant new information" to an EIR after consultation with the public but before certifying the EIR, the lead agency must pursue an additional round of consultation].)

As mentioned above, the EIR tasked the project sponsor with formulating a RAP for the project site that would reduce the prevalence of COCs below the target levels established in the health risk assessment. A RAP is one of two statutory documents, along with a removal action workplan (RAW), that DTSC may require in connection with environmental remediation. (See Health & Saf. Code, §§ 25323.1 [defining RAW], 25356.1 [defining RAP].)[19] The two documents serve essentially the same purpose, but DTSC permits the less

---

[19] These statutes have been repealed as part of a recodification, effective January 1, 2023, and operative January 1, 2024. Going forward, the statutes will be codified as Health & Safety Code sections 78130 [remedial action work plan] and, in relevant part, 79215 [remedial action plan]. (Stats. 2022, ch. 257, § 2.)

comprehensive RAW to be prepared if remediation is projected to cost less than 2 million dollars.[20]  In effect, a RAW is an abbreviated version of a RAP, but, unlike a RAP, the RAW is not subject to public comment.

At the time the draft EIR was prepared, the City assumed that the project sponsor would prepare a RAW rather than a RAP, and the draft EIR originally referred to the preparation of a RAW.  By the time the final EIR was issued, however, the project sponsor had elected to prepare the more comprehensive document.  Accordingly, the final EIR retrospectively changed the draft EIR's references to a "RAW" to a "RAP."[21]

The draft EIR lists a series of remedial measures that might be included in the RAP, recognizing that the RAP "would include a combination of the methods summarized here. . . . The [RAP] would identify the methods to be used, the specific areas and media for the given remedial methods [to] be applied, the regulatory standards to be achieved, and measures to restore the cap integrity where required."  A mitigation measure requires completion of the RAP and its approval by DTSC, which has regulatory jurisdiction over cleanup efforts at Howard Terminal, before the project can proceed.

---

[20] See "Removal Action Work Plan (RAW) Quick Reference Guide" on the DTSC's website at <https://dtsc.ca.gov/removal-action-work-plan-raw-quick-reference-guide/#:~:text=A%20Removal%20Action%20Work%20Plan,less%20than%20two%20million%20dollars.> [as of March 30, 2023].

[21] In this section, our discussion of the draft EIR adopts this change.  Accordingly, in the text below, we use the term "RAP" where the draft EIR originally used "RAW."

An EIR must be recirculated if "significant new information" is added after issuance of the draft EIR and prior to certification of the final EIR. (§ 21092.1; Guidelines, § 15088.5, subd. (a).) Recirculation requires making the revised EIR available for public review and consulting with other agencies again before certifying the EIR. (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 631.) "[N]ew information is 'significant,' within the meaning of section 21092.1, only if as a result of the additional information 'the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect.' [Citations.] Recirculation is not mandated under section 21092.1 when the new information merely clarifies or amplifies the previously circulated draft EIR, but is required when it reveals, for example, a new substantial impact or a substantially increased impact on the environment." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 447.) " ' "[T]he final EIR will almost always contain information not included in the draft EIR" given the CEQA statutory requirements of circulation of the draft EIR, public comment, and response to these comments prior to certification of the final EIR. . . . "[R]ecirculation was intended to be an exception, [not] the general rule." ' " (*Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1184.) The lead agency is not required to make an express finding regarding recirculation of an EIR, but the decision not to

recirculate must be supported by substantial evidence in the record. (*Save Our Capitol!*, *supra*, 85 Cal.App.5th at p. 1153.)

The Guidelines provide the following as examples of "significant new information" requiring recirculation: "[A] disclosure showing that: (1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented. [¶] (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance. [¶] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it. [¶] (4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Guidelines, § 15088.5, subd. (a).)

Petitioners provide no authority suggesting that a private party's preparation of a draft report or plan required by a mitigation measure constitutes the addition of new information "to an environmental impact report," as required by section 21092.1. This is particularly the case where, as here, the new information (i.e., the draft RAP) emerged after circulation of the final EIR. Recirculation is generally the result of new information contained in the final EIR. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1128–1129.) Although the decision to use a RAP

54

was disclosed in the final EIR, the release of the draft RAP, which petitioners contend is the event requiring recirculation, did not occur until later. Further, to the extent petitioners contend that recirculation is required because the public is entitled to review and comment on the remediation measures adopted in the RAP, such an opportunity for public comment is a required part of DTSC's approval of the RAP. (Health & Saf. Code, § 25356.1, subd. (e).) There is no risk that the remediation will proceed without the opportunity for public disclosure and comment.

Putting aside these preliminary issues, substantial evidence supports the City's decision not to recirculate the EIR to incorporate the contents of the draft RAP. The draft RAP does not add new information to the EIR, other than to confirm which of the available remedial measures discussed in the draft EIR have been deemed most appropriate for implementation. Petitioners do not suggest that the draft RAP discloses or will create a new significant environmental impact that is not discussed in the EIR, nor do they suggest that the draft RAP will increase the severity of a disclosed impact. At most, the RAP "merely clarifie[d] or amplifie[d]" the discussion in the draft EIR. (Guidelines, § 15088.5, subd. (b).)

Petitioners point to one of three alternative approaches in the draft RAP that would require the removal of far less soil than anticipated in the draft EIR. Assuming this alternative is adopted, it does not involve any new, previously undisclosed environmental impacts. The draft EIR made clear that its estimate of a much higher quantity of soil was "conservative,"

intended to disclose the environmental impact associated with excavating and hauling contaminated soil in a reasonable worst case. Leaving contaminated soil in place (assuming it can be done consistent with the standards required by the health risk assessment), reduces these impacts and is fully consistent with the remedial approach discussed in the draft EIR of leaving contaminated soil in place under an impermeable cap.[22]

### D. Deferred Mitigation of Contaminants

Petitioners assert that leaving the detailed formulation of remedial measures for hazardous substances to a RAP fails to satisfy the requirement of a specific performance standard in Section 15126.4, subdivision (a)(1)(B).

The draft EIR adopts three mitigation measures for handling contamination at the project site. The first, Mitigation Measure HAZ-1a, requires preparation of a RAP and its approval by DTSC, land use covenants, and "associated plans." It requires these plans to identify areas with COC concentrations above the target cleanup levels in the health risk assessment and to describe "specific remedial methods" to be applied to each of these areas, the procedures used to implement these methods, the analytical methods used "to verify that contaminated materials have been removed or treated such that the numerical cleanup

---

[22] To the extent petitioners' argument is that the switch from a RAW to a RAP requires recirculation, we similarly find substantial evidence supporting the failure to recirculate. A RAP performs the same function as a RAW, with more detail and public comment. (Compare Health & Saf. Code, §§ 25323.1, 25356.1.) Use of a RAP in no way changes the substantive environmental discussion of the EIR or the impacts of the project.

levels have been achieved," and cap restoration actions for those areas that will require a cap.  The second mitigation measure, HAZ-1b, requires that, prior to the issuance of any grading or other construction permit for the project, the project sponsor provide evidence that DTSC concurs that the proposed actions are consistent with the plans required by HAZ-1a.  Further, prior to the issuance of any certificate of occupancy, the project sponsor must provide evidence that DTSC has determined that the site is suitable for use.  The third measure, HAZ-1c, requires the preparation of Health and Safety Plans consistent with applicable regulations to protect workers and the public during the remediation activities.

There is little question that these mitigation measures satisfy the requirements of Section 15126.4.  The target cleanup levels from the health risk assessment provide a specific performance standard for each of the COCs identified in the EIR. Although petitioners contend that the mitigation measures "do not even reference the [target cleanup levels]," this is not correct; as indicated, Mitigation Measure HAZ-1a requires the project sponsor to verify that the target cleanup levels have been achieved prior to the issuance of any construction permits. Although the mitigation measures do not themselves describe the type of remedial actions that are to be considered, the draft EIR's thorough discussion of past and current remediation efforts describes the most common remediation measures, and the draft EIR cites and summarizes the contents of a consultant report

57

that contains a detailed consideration of remedial measures and alternatives for the site.

We conclude that the extensive history of remediation efforts at the site, the establishment of quantitative target levels for each COC, the presentation in the consultant's report of a detailed range of alternative approaches to remediation, and the presence of a state agency responsible for oversight of remediation are sufficient to satisfy the requirements for deferring the final details of contamination mitigation. (§ 15126.4, subd, (a)(1)(B).)

As respondents argue, the EIR's approach to mitigation of site contaminants is essentially identical to that found adequate in *City of Maywood, supra,* 208 Cal.App.4th 362. The large site on which the school district sought to build a new high school consisted of seven commercial and 40 residential parcels. (*Id.* at p. 372.) The district had been unable to secure permission to test the soil on most of the residential parcels, but it found a range of potentially hazardous contaminants on the remaining parcels. (*Id.* at p. 375.) By statute, the district was required to conduct further work under the oversight of DTSC, including preparing a supplemental investigation, remediating or removing the contaminated soil pursuant to a RAW, and obtaining DTSC safety certification. The EIR concluded that, after application of this procedure, the hazardous materials would not constitute a significant environmental effect. (*Id.* at pp. 375, 402–405.) The court recognized that " '[a] condition requiring compliance with regulations is a common and reasonable mitigation measure, and

58

may be proper where it is reasonable to expect compliance.' " (*Id.* at p. 409.) The court therefore concluded that the statutory procedure, requiring approval by DTSC, constituted adequate mitigation, holding that the " 'mitigation measures . . . f[e]ll squarely within the rule . . . that "when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts," and has committed to mitigating those impacts, the agency may defer precisely how mitigation will be achieved under the identified measures pending further study.' " (*Id.* at p. 412.)

Petitioners argue that *City of Maywood* is distinguishable because the school district could not formulate a complete remediation plan due to its inability to obtain permission to test soil over much of the property. Under the Guidelines, the details of a mitigation measure can be finalized at a later date when "it is impractical or infeasible to include those details during the project's environmental review." (§ 15126.4, subd. (a)(1)(B).) In *City of Maywood*, *supra*, 208 Cal.App.4th 362, it was infeasible to include details for two reasons. As noted, soil testing could not be completed. But mitigation details could not be included for the additional reason that they were within the ultimate regulatory jurisdiction of DTSC (*id.* at pp. 405–406), just as is the case here. The City's ability to test the entire project site therefore does not meaningfully distinguish *City of Maywood*.

## VI.  Findings Regarding Alternative Three

Petitioners contend that the EIR's analysis of the environmental consequences of Alternative 3, the alternative

requiring construction of an overpass, was insufficient to support the City's finding that "the impacts of Alternative 3 were analyzed in the EIR in sufficient detail to analyze the reasonably foreseeable impacts of Alternative 3."  Respondents argue that this claim was not exhausted below.  In response, petitioners contend, without further explanation, that their "challenge to the City's CEQA Findings is properly and timely asserted and there was no 'exhaustion' requirement, nor public comment period."

The EIR discussed three alternatives in addition to the no-project alternative.  Alternative 2 involved construction of a new ballpark on the site of the A's current ballpark.  Alternative 4 was a reduced project alternative, involving the construction of a ballpark with limited commercial and residential development.  For this reason, Alternative 3—described as "The Proposed Project with Grade Separation"—was, in effect, the project itself.  The City's findings recognized as much, stating, "For purposes of these findings, the CEQA project, evaluated in these CEQA Findings and Statement of Overriding Considerations, . . . shall refer to the proposed Project with a single vehicle grade separation overcrossing of the railroad tracks as described in Alternative 3: the Proposed Project with Grade Separation Alternative."  This was necessarily true because the EIR did not analyze an alternative that featured the level of development sought by the project sponsor but without an overpass.  Alternative 3 was thus effectively the project.

"Section 21177, subdivision (a) provides that before an alleged ground for noncompliance with CEQA may be brought to

court it must have been 'presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination.' " (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 237.)  Section 21177's exhaustion requirement, however, "does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing before the approval of the project . . . ."  (§ 21177, subd. (e).)  The party challenging a CEQA determination has the burden of proving exhaustion. (*Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 459.)

We will assume that a challenge to a public agency's compliance with CEQA's findings requirements is exempt from exhaustion under section 21177, subdivision (e) because those findings ordinarily issue only at the time of project approval, after the comment period and public hearing are over.  We conclude, nonetheless, that petitioners failed to exhaust their claim with respect to the Alternative 3 findings because we do not view it as a genuine challenge to the City's findings.

It is fundamental that an EIR must discuss the significant environmental impacts of a project.  (Guidelines, §15126.2, subd. (a).)  Because Alternative 3 was, as a practical matter, the project, petitioners' claim that the City erred in finding that "the impacts of Alternative 3 were analyzed in the EIR in sufficient

61

detail to analyze the reasonably foreseeable impacts of Alternative 3" is simply another way of saying that the EIR's discussion of the project's environmental impacts was inadequate. Indeed, as would be expected for such a claim, petitioners support their argument by citing various inadequacies in the draft EIR's discussion of these impacts.[23] Because a claim that the EIR's discussion of impacts was insufficient could have been raised during the comment period or at the public hearing, this claim is subject to the ordinary exhaustion requirement.

Petitioners cannot avoid the exhaustion requirement by characterizing their claim as a challenge to the lead agency's finding that the EIR was adequate. Taken to its logical conclusion, petitioners' position would allow any challenge to the adequacy of an EIR to be raised in the absence of exhaustion, merely by framing the challenge as a critique of the agency's required finding that the EIR complied with CEQA. (Guidelines, § 15090, subd. (a)(1) [prior to approving a project the lead agency shall certify that the EIR "has been completed in compliance with CEQA"].) We will not countenance such a circumvention of CEQA's procedural requirements.

Petitioners fail to demonstrate that their specific critiques of the EIR's discussion of the environmental impacts of the

_____

[23] Their primary contentions are that the EIR did not analyze the impacts of the project "with the Overpass added"; merely assumed that the construction of an overpass would intensify impacts already found significant and unavoidable, without quantifying the added impacts associated with the overpass; and did not analyze the impacts of relocating utilities.

overpass were raised during the administrative proceedings. These claims were thus not exhausted, and we are unpersuaded by their effort to frame their overpass-related challenge as one to the City's overall finding as to the adequacy of the EIR.

## VII.   Cumulative Impacts

Finally, petitioners contend that the EIR's cumulative impacts analysis should have included consideration of the impact of the use of a portion of the project site to expand the Port's turning basin for large vessels.  (Guidelines, § 15355 [cumulative impacts analysis is required when two or more individual effects, considered together, are considerable or compound other environmental impacts].)

Under an agreement negotiated between the project sponsor and the Port, an area at the southwest corner of Howard Terminal is designated a "Maritime Reservation Area."  At any time up until 2029, the Port may, under the agreement, terminate the project sponsor's development rights to some or all of 10 acres of the Maritime Reservation Area.  In that event, the area would be returned to the Port and excavated to expand a turning basin for large vessels within Oakland's Inner Harbor.  At the time of the draft EIR, the Port and the Army Corps of Engineers were jointly conducting a feasibility study of the expansion that was scheduled to be completed by the end of 2023.

The draft EIR did not consider the impacts of expanding the turning basin because "[t]he Port of Oakland has not proposed, designed, approved, or secured permits for" such an expansion.  According to the draft EIR, expansion of the turning

63

basis would be analyzed "as a separate project" by the Port should it elect to exercise the option to take back a portion of the project site. The draft EIR nonetheless discussed the environmental effects of turning basin expansion in each of its technical analyses to the extent such discussion was necessary "to address effects that are different from those identified for the proposed Project." The EIR did not consider turning basin expansion to be a "cumulative project" for purposes of the draft EIR because "an expanded turning basin is still being assessed in terms of feasibility."

Under CEQA, cumulative impacts analysis must consider not only the cumulative impacts of the project itself, but also "the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects." (Guidelines, § 15355, subd. (b); see also Guidelines, § 15130, subd. (a)(1); *League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 147–150 [discussing cumulative impacts analysis generally].) "In assessing the types of projects that should be included in a cumulative impacts analysis, our Supreme Court has clarified that an EIR need not discuss future action 'that is merely contemplated or a gleam in a planner's eye.' [Citation.] '[M]ere awareness of proposed expansion plans or other proposed development does not necessarily require the inclusion of those proposed projects in the EIR. Rather, these proposed projects must become "probable future projects." [Citation.]' [Citation.] ' " '[W]here future development is

64

unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' " ' " (*City of Maywood, supra,* 208 Cal.App.4th at pp. 397–398.)

There is no single accepted definition of "probable future project." The court in *Gray, supra,* 167 Cal.App.4th 1099, defined the term as "any future project where the applicant has devoted significant time and financial resources to prepare for any regulatory review." (*Id.* at pp. 1127–1128.) *City of Maywood, supra,* 208 Cal.App.4th 362 additionally required "evidence that the proposed project is both probable and sufficiently certain to allow for meaningful cumulative impacts analysis." (*Id.* at p. 399.)

The City's conclusion that turning basin expansion is not a "probable future project" is supported by substantial evidence. As the EIR noted, the Port and the Army Corps of Engineers are still studying the feasibility of turning basin expansion. Although these parties would not be engaged in a feasibility study if there were no perceived need for the expansion, it is implausible to deem expansion "probable" before there has been an official determination that it is even feasible. Further, there is no suggestion that the Port is "prepar[ing] for any regulatory review." (*Gray, supra,* 167 Cal.App.4th at pp. 1127–1128.) Petitioners argue that the feasibility study should be deemed a "regulatory review" for this purpose, but that phrase must be reserved for review by a regulatory body charged with approval of the project, which presupposes a relatively complete plan of

65

action. Nor are the details of expansion "sufficiently certain to allow for meaningful cumulative impacts analysis." (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 399.) At the time the draft EIR was prepared, turning basin expansion was still "merely contemplated or a gleam in a planner's eye," rendering it outside the scope of cumulative impacts analysis. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 398.)

## VIII.   Respondents' Cross-Appeal

Respondents challenge the trial court's holding that the EIR improperly deferred mitigation of wind impacts because the wind mitigation measure, which postpones formulation of the details of wind mitigation pursuant to Section 15126.4, subdivision (a)(1)(B), does not contain the type of "specific performance standard" required by the guideline. (§ 15126.4, subd. (a)(1)(B)(1).)

The draft EIR contained a relatively brief discussion of the project's impact on wind currents at the project site. As the EIR recognized, the effect of wind increases with its speed. Buildings that stand alone or are much taller than surrounding structures can capture and redirect wind; such "redirected winds can be relatively strong and turbulent and may be, in some instances, incompatible with the intended uses of nearby ground-level pedestrian spaces." The EIR concluded that the project will have a significant adverse environmental impact if it creates winds that exceed 36 mph for more than one hour during daylight

66

hours.[24]  A wind tunnel study suggested that the project could, at completion, produce winds exceeding this significance level for a minimum of 100 to 150 hours annually.

The EIR's discussion acknowledged a variety of design and landscaping modifications that might reduce the wind impact of the project's buildings.  The EIR was concerned, however, that "it cannot be stated with certainty at this stage of Project design that all wind hazards identified in the wind tunnel test would be eliminated" with this type of mitigation.  As a result, the EIR concluded that the wind impact of the project would be significant and unavoidable.

The EIR's single wind mitigation measure requires a wind tunnel analysis for each proposed building exceeding 100 feet in height prior to the issuance of a building permit.  The mitigation measure requires no further action if the analysis determines that the building "would not create a net increase in hazardous wind hours or locations . . . compared to then-existing conditions." If, however, the building's design would cause an increase in significant wind impacts, the project sponsor is required to "work with the wind consultant to identify feasible mitigation strategies, including design changes (e.g., setbacks, rounded/chamfered building corners, or stepped facades), to eliminate or reduce wind hazards to the maximum feasible extent without unduly restricting development potential.  Wind

---

[24] For comparison, existing wind speeds at the project site average 27 mph, and winds greater than 38 mph "make it nearly impossible to walk into the wind and increase difficulty with balance."

reduction strategies could also include features such as landscaping and/or installation of canopies along building frontages, and the like."

This performance standard fails to satisfy Section 15126.4 for the simple reason that it is not "specific." By requiring a reduction in wind impacts "to the maximum feasible extent *without unduly restricting development potential*," the mitigation measure appears to seek a balance between competing factors, mitigating adverse wind impacts only to the extent possible without "unduly" impairing the commercial value of the buildings. (Italics added.) Even assuming that a mitigation measure may, in appropriate circumstances, strike a balance between the reduction of environmental impacts and commercial functionality, the mitigation measure must inform the public *where* that balance has been struck. Mitigation measures "need not include precise quantitative performance standards" (*Sierra Club*, *supra*, 6 Cal.5th at p. 523), but Section 15126.4's reference to "specific" performance standards implies a reasonably clear and objective measure of compliance. One purpose of the specificity requirement is presumably to permit the public, the responsible regulator, and the project sponsor to determine the type and extent of mitigation that must be considered and to provide a standard for judging compliance with the mitigation measure once the details are finalized. Unless the performance standard is expressed in reasonably clear, objective terms, the interested parties cannot know how the mitigation measure should be interpreted and applied.

The vague language of the performance standard in the EIR's wind mitigation measure fails this test. On the one hand, the project sponsor is required to "eliminate or reduce wind hazards to the maximum feasible extent"; on the other hand, the project sponsor cannot be required to "unduly" restrict the "development potential" of the project to mitigate wind impacts. The critical point is reached when the wind mitigation measures begin to "unduly" reduce the development potential of the project. But the point at which a restriction on development potential becomes "undue" depends entirely on the value placed on reducing wind impacts by the agency charged with overseeing compliance with the mitigation measure, the City Department of Planning & Building. If the agency places a high value on the reduction of wind impacts, a substantial restriction in development potential will not be deemed undue. If the agency places little value on reducing adverse wind effects, even small reductions in development potential will be undue. For this reason, the mitigation measure provides no reliable means for deciding the degree of wind impact reduction required with respect to a particular building.

This difficulty is enhanced by the failure of the mitigation measure to explain or define its language. As noted, use of the inherently subjective term "unduly" without further explanation leaves the decision on mitigation largely to the discretion of the compliance agency. This is compounded by the EIR's failure to explain the concept of "development potential." The phrase appears nowhere else in the discussion of wind impacts, and the

mitigation measure itself makes no attempt to explain or define the term.

In addition, the mitigation measure does not fully comply with the requirement that it "identif[y] the type(s) of potential action(s) that can feasibly achieve that performance standard and that will be considered, analyzed, and potentially incorporated in the mitigation measure." (§ 15126.4, subd. (a)(1)(B)(3).) The wind mitigation measure merely mentions three possible design changes in a parenthetical, combined with a final mention of "landscaping and/or installation of canopies along building frontages, and the like." There is no indication whether more significant changes in overall building size or location may be considered or, if not, why more substantial changes are deemed infeasible.

Respondents implicitly disavow the actual performance standard in the mitigation measure, instead citing the measure's initial language, which provides, "With the goal of preventing to the extent feasible a net increase in the number of hazardous wind exceedance locations, compared to existing conditions, . . ." Respondents argue that this language incorporates the City's quantitative standard for a significant wind effect as a performance standard. Although we agree that the EIR's standard for a significant wind effect (i.e., winds that exceed 36 mph for more than one hour during daylight hours) is appropriately specific, the cited language does not establish that measure as a "performance standard." Instead, the language clearly labels avoidance of significant wind effects as a "goal," to

70

be achieved "to the extent feasible." In so doing, this language merely reiterates the legal obligation imposed on the City by CEQA—to mitigate significant environmental effects to the extent feasible—without providing any guide as to how that obligation must be satisfied in particular circumstances.

Respondents further argue that a specific performance standard—at least, beyond reiteration of the basic obligation to mitigate—was not required because it is "uncertain" whether full mitigation can be achieved. We find no support for respondents' position that specific performance standards are unnecessary when the lead agency adopts a statement of overriding considerations. Section 15126.4 contains no exemption from the requirement of a specific performance standard when the lead agency adopts a statement of overriding considerations. Adoption of such a statement "does not negate the statutory obligation to implement feasible mitigation measures. 'Even when a project's benefits outweigh its unmitigated effects, agencies are still required to implement all mitigation measures unless those measures are truly infeasible.' " (*King & Gardner*, *supra*, 45 Cal.App.5th at p. 852.)

Finally, respondents' counsel insisted at oral argument that it was not possible for the EIR to adopt a specific performance standard because it is uncertain what the wind impact of the project, once finalized, will be. But that is often (if not always) the case with deferred mitigation measures, and Section 15126.4 nonetheless requires specificity. Even assuming respondents are correct that the EIR cannot adopt the type of quantitative

71

standard it employed in determining a significant wind impact, an arithmetically precise standard is not required.  (*Sierra Club*, *supra*, 6 Cal.5th at p. 523.)

In sum, we reject respondents' cross-appeal challenging the trial court's grant of the petition with respect to the wind mitigation measure.

## DISPOSITION

The judgment is affirmed.

BROWN, ACTING P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

*East Oakland Stadium Alliance, LLC v. City of Oakland* (A166221)

Trial Court:      Alameda County Superior Court

Trial Judge:      Hon. Brad Seligman

Counsel:          Pillsbury Winthrop Shaw Pittman, Ronald Van Buskirk, Margaret Rosegay, and Stacey Wright for Plaintiffs and Appellants.

Shana Lazerow, Idalmis Vaquero, and Jina Kim as Amicus Curiae on behalf of Plaintiffs and Appellants.

Barbara Parker and Maria S. Bee, City Attorney; Meyers Nave Riback Silver & Wilson, Timothy D. Cremin and Shaye Diveley for Defendants and Appellants.

Mary Richarson and Kimberly McIntyre; Best Best & Krieger, Charity Schiller, Sarah E. Owsowitz and Tiffany Michou for Real Party in Interest and Appellant Port of Oakland.

D'Lonra Ellis; Gibson Dunn & Crutcher, Mary G. Murphy, Sara Ghalandari; Remy Moose Manley, Whitman F. Manley, Christopher L. Stiles, for Real Party in Interest and Appellant Oakland Athletics Group, LLC.